SEAN P. REIS (SBN 184044)
(sreis@edelson.com)
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: 949.459.2124

JAY EDELSON (Admitted *Pro Hac Vice*)
(jedelson@edelson.com)
RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
(rbalabanian@edelson.com)
CHRISTOPHER L. DORE (Admitted *Pro Hac Vice*)
(cdore@edelson.com)
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370

[Additional counsel included in signature block.]

*Attorneys for Plaintiffs NICOLE PIMENTAL, JESSICA FRANKLIN, and the Settlement Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| NICOLE PIMENTAL and JESSICA FRANKLIN, individually and on behalf of all others similarly situated,<br><br>    *Plaintiffs,*<br><br> v.<br><br>GOOGLE INC., a Delaware corporation, and SLIDE, INC., a Delaware corporation,<br><br>    *Defendants.* | Case No. 11-cv-02585-YGR<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

## I. INTRODUCTION

Pursuant to the Court's directives at the Final Fairness Hearing that took place on May 14, 2013, Plaintiffs here respectfully provide further detail regarding the proposed *cy pres* recipient under the instant settlement, the International Association of Privacy Professionals (the "IAPP").[1] (Dkt. 103.) What follows is an explanation of the process by which the Parties selected the IAPP as an appropriate *cy pres* recipient; additional background on the IAPP itself, including the work it does and its nexus to the subject matter of this lawsuit and the benefit to absent class members that will result from a distribution to the IAPP; and, an analysis of the current law on *cy pres* distributions in the Ninth Circuit and specifically, the appropriateness of the IAPP as a *cy pres* recipient here.

For the reasons described below, Plaintiffs Nicole Pimental and Jessica Franklin respectfully request that the Court approve the Parties' proposed *cy pres* distribution to the IAPP and otherwise grant final approval of the Parties' proposed class action settlement.

## II. THE PARTIES' *CY PRES* SELECTION PROCESS AND ADDITIONAL BACKGROUND ON THE IAPP.

### A. The Parties' Selection of the IAPP as the Proposed *Cy Pres* Recipient.

As counsel stated at the Fairness Hearing, the Parties chose the IAPP only after lengthy discussions, the creation of a formal selection process, and numerous back and forths after they were unable to reach agreement on the potential recipients initially proposed. (*See* Declaration of Rafey S. Balabanian ¶ 3, attached as Exhibit 1.) Specifically, following entry of the Court's Preliminary Approval Order, the Parties began by discussing (through counsel) the process by which they would select an appropriate *cy pres* recipient for submission to the Court. (Balabanian Decl. ¶ 3.) The result of those discussions was agreement on a three-step process whereby the Parties would first each propose a list of at least three potential recipients. (*Id.* ¶ 4.) Next, they would vet each other's

---

[1] The Court also requested that Settlement Class Counsel provide additional detail regarding Plaintiffs' request for an award of reasonable attorneys' fees and costs—namely, records detailing Counsel's attorney-time and hourly rates. (Dkt. 104.) Per the Court's Order, Plaintiffs filed Counsel's detailed billing records on May 17, 2013. (Dkt. 105.)

proposals and confer regarding whether there was agreement on one (or more) recipients or there were objections to be raised. (*Id.*) Finally, if the Parties were unable to reach agreement through this initial exchange and vetting process—which, as explained below, was the case—they would confer further in an attempt to reach a consensus before ultimately (and only as a last resort) each separately submitting proposals to the Court. (*Id.*)

For their part, Plaintiffs initially proposed that any *cy pres* distribution be made to either the Center for Democracy and Technology, the Rose Foundation, or the Privacy Project at U.C. Hastings. (*Id.* ¶ 5.) Google proposed five entirely different recipients, including the National Network to End Domestic Violence, the Red Cross, the Human Rights Project for Girls, Witness, and Rock the Vote. (*Id.* ¶ 6.) The Parties rejected each of their initial proposed recipients. From Plaintiffs' perspective, while they agreed that Google's proposed recipients are all well-respected (and much more well known) organizations that do admirable and effective work across the country, they cautioned Google, stating "as you may be aware, the 9th circuit has taken a turn in the last year that strongly cautions against *cy pres* recipients that are not at least somewhat in line with the purpose of the lawsuit and serve the class in a related manner. Hence, our suggestions pertain to consumer privacy, specifically relating to technological and online privacy." (*Id.* ¶ 7.) Plaintiffs specifically cited to *Lane v. Facebook, Inc.*, 696 F.3d 811(9th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011), and *Dennis v. Kellogg Co.*, 697 F.3d 811 (9th Cir. 2012) for the proposition that any *cy pres* recipients must perform work that has some nexus to the subject matter of this lawsuit. (*Id.*) It was on that basis, that Plaintiffs rejected each of Google's proposals. (*Id.* ¶ 7.) Google also rejected each of Plaintiffs' original three proposals because they felt, for one reason or another, that their affiliation with those proposed recipients may create a conflict. (*Id.* ¶ 8.) For example, Google rejected the Center for Democracy and Technology because it had previously sponsored a policy fellowship with that organization, and felt the affiliation may make a distribution to the CDT inappropriate.

With each of the Parties' initial proposals having been rejected, Plaintiffs proposed several

additional recipients, including the IAPP.[2] (*Id.* ¶ 9.) Thereafter, the Parties held several telephone conferences (and participated in several e-mail exchanges) to discuss any existing conflicts or related issues with the organizations appearing on Plaintiffs' larger list. The result of those discussions was the Parties' joint selection of the IAPP as the proposed *cy pres* recipient under the settlement. (Balabanian Decl. ¶ 10.)

From there, the Parties agreed that Class Counsel would contact the IAPP and request a proposal from it that would identify the ways in which its work paralleled the issues in this litigation and how the proposed *cy pres* distribution would further the interests of absent class members. (*Id.* ¶ 11.) In particular, Counsel spoke at length with the IAPP's President and CEO, Trevor Hughes, who described in detail the IAPP's efforts in the privacy space, generally, and with respect to privacy as it relates to consumer technology and telecommunications, specifically. (*Id.* ¶ 12.) Mr. Hughes also provided the Parties with a multi-page proposal outlining the IAPP's intended use for any *cy pres* distribution it might receive, including the funding of the Westin Fellowship Program focused on improving consumer privacy protections and the creation of a "TCPA Compliance Tool Kit"—designed as a resource for organizations to ensure compliance with the TCPA—that would be made available to its business members, its Internet subscribers, and the public at-large. (*Id.*; *see also* Letter from Trevor Hughes, attached as Exhibit 1-A.)

### B. Additional Background Regarding IAPP's Work as it Relates to this Case.

Founded in 2000, the IAPP is a not-for-profit association[3] that has operated in the consumer

---

[2] Plaintiffs proposed twenty (20) potential *cy pres* recipients in all. The complete list included: the Center for Democracy and Technology, the Rose Foundation, or the Privacy Project at U.C. Hastings, the Center for Digital Democracy, EPIC, Electronic Frontier Foundation, Consumer Watchdog, Privacy Rights Clearinghouse, U.S. Public Interest Research Group, World Privacy Forum, International Association of Privacy Professionals, High Tech Law Institute of Santa Clara/Markkula Center for Applied Ethics, NYU Information Law Institute, Berkeley Center for Law & Technology/Samuelson Clinic, Berkman Center for Internet and Society (Harvard), Privacy Project (UC Hastings), Stanford Center for Internet and Society, University of Maine Center for Law + Innovation, and the USC Gould School of Law. (*Id.* ¶ 9.)

[3] Per the Court's question during the Final Fairness Hearing, Class Counsel notes that the IAPP is a 501(c)(6) not-for-profit organization, as compared to a 501(c)(3), based on its status as an "association" or "business league." This designation is based primarily on its status as a membership oriented organization that provides specific services to those members. The IAPP is

privacy field for nearly thirteen years, during which time it has focused its work primarily on educational and compliance efforts with businesses. In particular, the IAPP works directly with more than 12,000 members (including Google, dozens of Fortune 500 companies, several global law firms, and governmental agencies), in 78 countries, educating those businesses on emerging privacy issues, providing them tools and guidelines to avoid violating consumer privacy rights, and otherwise "defin[ing], promot[ing] and improv[ing] the privacy profession globally through networking, education and certification." (*See* Screenshots of www.privacyassociation.org, attached to the Balabanian Declaration as Exhibit 1-C.)

The IAPP is the "largest and most comprehensive global information privacy community and resource...." (*Id.*) It offers a "full suite of educational and professional development services and holds annual conferences that are recognized internationally as the leading forums for the discussion and debate of issues related to privacy policy and practice." (*Id.*) Moreover, the IAPP is responsible for developing and launching the first broad-based credentialing program in information privacy—the Certified Information Privacy Professional—which is the leading privacy certification for thousands of professionals who serve the data protection, information security, and legal compliance needs of their organizations. (*Id.*)

Most importantly and as explained in Section II.A above, the IAPP has committed to using any *cy pres* distribution received in this case in ways that account for the nature of the Plaintiffs' claims (protecting consumer privacy), the objectives of the underlying statutes (protecting telephonic consumer privacy), and the interests of the absent Class members (having their privacy protected going forward). As further evidence of their work in the privacy space, the IAPP has been approved as an appropriate *cy pres* recipient by other courts in this District in other privacy cases in the past. *See, e.g., In re Netflix Privacy Litig.*, No. 11-cv-00379, 2013 WL 1120801, at * 11 (N.D. Cal. Mar. 18, 2013) (approving numerous *cy pres* recipients, including the IAPP, that it found "to be

---

not organized for profit and no part of its net earnings inures to the benefit of any private shareholder or individual. (*See also* IAPP's non-profit corporate registrations, attached to the Balabanian Declaration as Exhibit 1-B.)

sufficiently related to issues that form the core of [the] lawsuit.");[4] *In Re Quantcast Advertising Cookie Litigation*, No. 2:10-cv-05484, Dkt. 83 (C.D. Cal. 2011) (approving the IAPP as an appropriate *cy pres* recipient and noting that it and the other approved organizations "demonstrated a nexus with the issues raised in the Litigation—particularly, research and education related to avoidance of future harm to consumers").

### III. STANDARD FOR APPROVAL OF *CY PRES* DISTRIBUTION AND RECIPIENTS, AND THE APPROPRIATENESS OF THE IAPP AS A *CY PRES* RECIPIENT IN THIS CASE.

#### A. Legal Standard.

At its most basic, "[a] cy pres remedy…is a settlement structure wherein class members receive an indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment." *Lane*, 696 F.3d at 819. There are two primary factors to consider when determining an appropriate *cy pres* distribution. First, the *cy pres* funds must represent a "distribut[ion of] unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin*, 663 F.3d at 1036. Second, the *cy pres* remedy must "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." *Id*.

#### B. The IAPP Easily Meets the Ninth Circuit's Standards as a *Cy Pres* Recipient and the Proposed Distribution Should be Approved by the Court.

The proposed *cy pres* distribution here meets both of the Ninth Circuit's requirements. First, the funds to be distributed are "unclaimed" inasmuch as they will be paid from the Settlement Fund, but were not otherwise distributed to class members (*e.g.*, in the form of claims payments or attorneys' fees). And, as explained below, the work performed by the IAPP also dovetails with the primary issues in this litigation and the interests of absent class members—namely, educating businesses about consumer privacy rights and avoiding violations of those rights as they relate to consumer technology, telecommunications and the TCPA.

---

[4] The IAPP was one of twenty *cy pres* recipients in the *Netflix* matter approved by the Honorable Edward J. Davila.

To the latter point and in particular, the IAPP has advanced initiatives to educate, advocate for, and protect consumers against potential privacy violations occurring through consumer technology and telecommunications, like those at issue in this case. And, the organization intends to use any *cy pres* distribution it may receive to (i) fund the Westin Fellowship Program focused on improving consumer privacy protections[5], and (ii) create a "TCPA Compliance Tool Kit" for use by companies and consumers alike as a resource to ensure compliance with the TCPA and other consumer privacy rights.[6] (*See* Exhibit 1-A and 1-C to the Balabanian Declaration.)

For these reasons, it is clear that under Ninth Circuit precedent, the IAPP is an appropriate *cy pres* recipient in this case and the proposed distribution to it should be approved.

### C. There are no Conflicts Amongst the Parties and the IAPP such that the Proposed *Cy Pres* Distribution Would be Inappropriate.

Finally, the Court requested additional information to confirm that there were no improper connections between the Parties or their counsel and the IAPP such that approving a *cy pres* distribution to them would be inappropriate. There are none.

First, neither Plaintiffs nor Settlement Class Counsel have any affiliation with the IAPP. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at * 11 (approving the IAPP as appropriate *cy pres* recipient in privacy class action and finding no affiliation with Edelson LLC).[7] Indeed, Plaintiffs and

---

[5] According to IAPP, the Westin Fellowship Program was created to encourage and enable research and scholarship in the field of privacy. Fellows spend a year at the IAPP exploring select topics that develop better privacy practices in the marketplace. The work product of the Westin Fellowship Program is practical and actionable research that organizations – both public and private – can use to ensure better privacy practices across the entire country. (*See* Exhibit 1-A to the Balabanian Declaration.)

[6] The TCPA "Tool Kit" would include a TCPA Compliance Guide, TCPA Compliance Guide checklist, TCPA Compliance Guide web conference, and a TCPA Compliance Guide slide deck, all of which would be designed for wide distribution and availability without cost. The guides and conferences would be a resource for organizations to ensure compliance with the TCPA and encompass the very latest in best practices. (*See* Exhibit 1-A and 1-C to the Balabanian Declaration.)

[7] The distribution to the IAPP in the *Netflix* matter, while approved, has yet to be distributed as the case is currently on appeal to the Ninth Circuit—though not because of any issue with the IAPP's appropriateness as a *cy pres* recipient.

Class Counsel have never donated any money to the IAPP, have never before worked with the IAPP, and prior to their selection as one of twenty (20) *cy pres* recipients in the case of *In re Netflix Privacy Litig.*, have never had any contact with anyone from the IAPP. (Balabanian Decl. ¶ 13.)

With respect to Google, it has no improper affiliations with the IAPP either. Google's only affiliation with that institution is that it is one of the IAPP's more than 140 corporate members, and one of Google's in-house attorneys, Mr. Keith Enright, serves on the IAPP's board of directors along with nineteen (19) other individuals (which, is in addition to thirteen (13) other advisory boards made up of over one hundred individuals).[8] Those types of affiliations, however, are not of the sort that the Ninth Circuit and courts in this District have previously identified as problematic or that would otherwise render a distribution to the IAPP in this case inappropriate. *See, e.g., Lane*, 696 F.3d at 824 (holding that the mere fact that plaintiff's counsel and one of the defendant's executives would both sit on the board of the newly created organization set to receive a proposed *cy pres* distribution did not render that organization an inappropriate recipient); *In re Netflix Privacy Litig.*, 2013 WL 1120801 (approving *cy pres* recipients despite that defendant's employees were members of the IAPP and other employees had attended IAPP conferences, where defendant's counsel was one of several law firm sponsors of The Berkeley Center for Law & Technology, and where a director at the Stanford Center for Internet and Society was formerly an attorney with defendant's law firm); *In re EasySaver Rewards Litig.*, No. 09CV2094 AJB WVG, 2013 WL 435032 (S.D. Cal. Feb. 4, 2013) (holding that the fact that three attorneys involved in the litigation were alumni of the proposed *cy pres* recipient law school did not, alone, render the law school an

---

[8] As far as the IAPP's affiliation with Google is concerned, the Parties were aware of the fact that Google was one of the IAPP's more than 140 corporate members at the time they selected the IAPP, but were unaware of the fact that one of Google's in-house attorneys, of which there are hundreds, would be serving on the board as of March of this year. (Balabanian Decl. ¶ 14.) The reason for this was likely due to the fact that the IAPP did not select Mr. Enright to serve on the board until February 20th of this year, which was the time when the Parties were negotiating the selection of proposed recipients. (*Id.*) As such, Google's attorneys have stated that they were unaware of the appointment at the time the Parties jointly selected the IAPP. (*Id.*) Regardless, as the Ninth Circuit pronounced in *Lane*, the fact that an employee of the settling defendant serves on the board of directors of a potential *cy pres* recipient does not create an objectionable conflict. *Lane*, 696 F.3d at 824.

inappropriate recipient where there was no suggestion of any impropriety or other conflicts between counsel and the law school).

Accordingly, for these reasons as well, the IAPP is an appropriate *cy pres* recipient here and the Court should approve the Parties' proposed distribution to it.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs Nicole Pimental and Jessica Franklin, individually and on behalf of the Settlement Class, respectfully request that the Court enter an Order (i) approving the IAPP as a *cy pres* recipient,[9] (ii) otherwise granting final approval of the Parties' proposed class action settlement, and (iv) providing such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**NICOLE PIMENTAL** and **JESSICA FRANKLIN**, individually and on behalf of all others similarly situated,

Dated: May 24, 2013

By: /s/ Rafey S. Balabanian
      One of Plaintiffs' Attorneys

JAY EDELSON (Admitted *Pro Hac Vice*)
(jedelson@edelson.com)
RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
(rbalabanian@edelson.com)
CHRISTOPHER L. DORE (Admitted *Pro Hac Vice*)
(cdore@edelson.com)
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

---

[9] Since the Final Fairness Hearing, Class Members filed an additional 412 claims resulting in an additional $206,000 claimed. That brings the amount of claims to 5,598, totaling $2,799,000. As Class Counsel stated at the Final Fairness Hearing, the Claims Deadline is yet to run (in that it's 45 days from the entry of Final Judgment (should that occur)), and counsel predicts that, based on the rate of claims filed to date, an additional 750 – 1,500 claims will be filed by Settlement Class Members up to the Claims Deadline, which would take the total amount of claims to well over $3,000,000, and reduce any *cy pres* distribution accordingly. And, ultimately, there is still a chance that the full amount of the Settlement Fund made available for Class Member claims will be exhausted, leaving little to no monies for *cy pres* distribution.

SEAN P. REIS (SBN 184044)
(sreis@edelson.com)
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124

SCOTT D. OWENS (Admitted *Pro Hac Vice*)
(scott@scottowens.com)
LAW OFFICES OF SCOTT D. OWENS, ESQ.
2000 East Oakland Park Boulevard, Suite 106
Ft. Lauderdale, Florida 33306
Tel: 954.306.8104

LEIGH ANNE PARKER (SBN 170565)
(lparker@weisslawllp.com)
WEISSLAW LLP (f/k/a Weiss & Lurie)
1516 South Bundy Drive, Suite 309
Los Angeles, California 90025
Tel: 310.208.2800

STEFAN COLEMAN (Admitted *Pro Hac Vice*)
(law@stefancoleman.com)
LAW OFFICES OF STEFAN COLEMAN, LLC
1072 Madison Avenue, Suite 1
Lakewood, New Jersey 08701
Tel: 877.333.9427

## CERTIFICATE OF SERVICE

    I, Christopher L. Dore, an attorney, hereby certify that on May 24, 2013, I caused the above and foregoing ***Plaintiffs' Supplemental Memorandum in Support of Final Approval of Class Action Settlement***, to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 24th day of May 2013.

                                          /s/ Christopher L. Dore